# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Jeanne Dovenmuehler,

               **Plaintiff,**

v.                                   **ORDER**
                                   **Civil File No. 05-1894 (MJD/RLE)**

St. Cloud Hospital,

               **Defendant.**

George E. Antrim III, George E Antrim III, PLLC, Counsel for Plaintiff.

Jacqueline M. Schuh and Paul R Harris, Hughes Mathews PA, Counsel for Defendant.

## I.     INTRODUCTION

      This case arises out of a dispute over Plaintiff's termination of employment. The case is currently before the Court on Defendant St. Cloud Hospital's ("the hospital") motion for summary judgment.  [Doc. No. 17.]  Defendant seeks summary judgment on all counts in the complaint and dismissal of the case with prejudice.  Oral argument was heard on September 27, 2006.  For several reasons, discussed below, Defendant's motion is granted.

## II.   FACTUAL BACKGROUND

The facts will be recited in the light most favorable to the Plaintiff. Plaintiff was addicted to cocaine in the early 1980s, but she attended in-patient treatment and has not used cocaine since the mid 1980s.  Plaintiff has been a registered nurse in Minnesota since 1993, and worked at St. Joseph's Hospital in Brainerd from October 14, 2002 to July 2004. Plaintiff was terminated from her job at St. Joseph's for diverting (stealing) schedule II narcotics.  Plaintiff voluntarily reported herself to Minnesota Health Professionals Services Program ("HPSP") after her termination, seeking help for her chemical dependency.

On July 15, 2004, Plaintiff applied for a registered nurse position in Defendant's Children's Center.  The Children's Center is comprised of four units, one of which is the Neonatal Intensive Care Unit ("NICU").  The Children's Center serves children from pre-term infants up to seventeen year olds.  All these children are very ill and fragile, and sixty-five percent of the unit's daily patient load are ICU patients.  Oftentimes ninety-eight percent of the unit's patients are under the age of two.  The unit is set up with private rooms and curtained areas in such a way that there are no lines of visibility into most rooms.

The duties of the position Plaintiff applied for included, but were not limited to, "direct patient care, including administering routine and emergency medications, functioning as a charge nurse in the absence of a core charge nurse,

and collaborating and coordinating care with other healthcare team members to
promote quality healthcare."  (Def. Mem. Supp. Mot. Summ. J. at 5 (citing
Cormier Aff. ¶ 6; Ex. 4).)

In her employment application, Plaintiff listed her nursing experience
starting in 1998.  Plaintiff did not disclose on her application why she left
employment at St. Joseph's.  Plaintiff was interviewed by Children's Center
Director Anne Cormier on July 28, 2004, and was hired on August 5, 2004.
Plaintiff's hiring was contingent upon successful completion of a Medical Pre-
Placement Evaluation with Occupational Health Services ("OHS").  Fay Chawla is
the director of OHS.

Plaintiff's evaluation took place on August 10, 2004.  During the evaluation,
Plaintiff disclosed only the following medical conditions:  (1) carpel tunnel in her
left hand; (2) rare leg soreness; (3) a back injury that required a partial
laminectomy in 1991; and (4) hepatitis C from an unknown source diagnosed in
1999.  Plaintiff never disclosed that she was chemically dependent.
(Dovenmuehler Dep. at 116.)  On the same date, Plaintiff signed a document that
states the following:

> I certify that the foregoing information is true to the best of my
> knowledge.  I understand misrepresenting the facts called for above
> may forfeit this employment opportunity.  I also understand that an

affirmative answer to any of these question is not necessarily a bar to employment.

(Chawla Aff. Ex. 1.)

Pursuant to Minn. Stat. § 214.17-25 and the hospital's policies, any healthcare employee with a high-risk illness such as hepatitis C must be placed on a medical hold until the hospital receives confirmation of the diagnosis and receives approval from the Minnesota Department of Health ("MDH") to allow the employee to perform her job.  MDH concluded that Plaintiff's condition could be accommodated, and Chawla then scheduled Plaintiff for general orientation at the hospital so she could start her job.  Following orientation, Plaintiff was assigned to work rotating twelve-hour a.m. and p.m. shifts.

In late September 2004, approximately six weeks into her employment at the hospital, Plaintiff notified Chawla that she was under an HPSP Plan ("the Plan") and provided Chawla with copies of the relevant documents.  Plaintiff was put on the Plan on September 21, 2004.

Pursuant to the hospital's policy, Chawla took Plaintiff off nursing rotations pending further investigation, but kept her employed in a non-practicing capacity. On September 29, 2004, Chawla met with Plaintiff to discuss the Plan restrictions. During this meeting, Plaintiff admitted to Chawla that she was terminated from her position at St. Joseph's Medical Center due to the alleged theft of Vicodin, a

Schedule II narcotic.  (Chawla Dep. at 42, 44-46; Dovenmuehler Dep. at 80-81.)

Plaintiff did not tell Chawla that she was chemically dependent.  (Id. at 115-16.)

Pursuant to hospital policy, Human Resources Director Kelly Thomton and

Supervisor Anne Cormier met with Plaintiff to discuss the Plan and employment

options.  During this discussion, the hospital expressed concern about the

following provision in the Plan:

> PRACTICE RESTRICTIONS:
> a.  Maintain supervised access to controlled substances . . . for
>     2000 hours of professional practice OR one year of continuous
>     abstinence from alcohol and drugs of abuse AND until HPSP
>     authorizes in writing to lift or amend the restriction.  Prior to
>     the restriction being amended, participant is responsible for
>     ensuring that HPSP receives written documentation from the
>     work site monitor attesting to the number of hours participant
>     has worked with the restriction in place.

(Chawla Aff. Ex. 9 at 1)  (emphasis in original).  The Plan required Plaintiff to self-

monitor and report, and required her employer to take steps to monitor and

provide reports to HPSP about Plaintiff's access to, and dispensing of, controlled

substances.  The options discussed and considered to insure compliance included

the following:

> 1.   Limiting [Plaintiff] to duties not involving access to or
>      dispensing of medications;
> 2.   Placing a "buddy" system in effect with a nurse from
>      another Unit for the purpose of monitoring medications;
> 3.   Hiring an additional nurse to shadow [Plaintiff] during her
>      shifts;
> 4.   Providing visual oversight of [Plaintiff]; and

5.          Transferring [Plaintiff] to another nursing position in the
            Children's Center [that] would not involve medication
            administration or would not require additional oversight.

(Def. Mem. Supp. Mot. Summ. J. at 12 (citing Thomton Aff. ¶4; Cormier Aff.

¶11)).  As part of the hospital's process, Thomton and Cormier spoke with others

concerning options for allowing Plaintiff to keep her job while the hospital met

the requirements of the Plan.

     The hospital had previous experience with HPSP plans, and had always

interpreted "supervised access" to mean requiring special procedures to monitor

an employee's ability to access, dispense, and properly chart administration of

medications.  To accomplish this, the hospital has someone observe the dispensing

of narcotics.  (Thomton Dep. at 22.)  In such cases, the hospital considers the

following factors:

1.     what unit the employee works on;
2.     the essential functions of the specific position;
3.     the unit size and location;
4.     the patient population being served;
5.     the staffing of the unit; and
6.     the budget for the unit.

(Pl. Mem. Opp. Mot. Summ. J. at 13.)  These factors are discussed by the

employee's supervisor, the Human Resources Director, and the employee.  Given

the essential functions of Plaintiff's job, the layout of the unit, the need for nurses

to work independently, and the patient population of the unit, the hospital

concluded that it could not assist Plaintiff in complying with the Plan.  Plaintiff was terminated on October 27, 2004 because the hospital could not accommodate the Plan's restriction of "supervised access to controlled substances."  The termination was confirmed by letter dated November 8, 2004.  The letter stated, in pertinent part, that "[t]he purpose of this letter is to confirm the termination of your employment effective October 27, 2004.  As we discussed, your position as a Registered Nurse in the Children's Center doesn't allow for the restriction of supervised narcotics access."  (Thomton Aff. Ex. 7.)

Plaintiff is currently employed as an RN at St. Gabriel's Hospital in Little Falls and the University of Minnesota Fairview Hospital with no "extraordinary narcotics security measures."  (Pl. Mem. Opp. Mot. Summ. J. at 4.)  Both hospitals accommodate the Plan's restrictions.  (Id.)

## III.    DISCUSSION

### A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. CIF. P. 56(c); <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  <u>Id.</u> at 323.  Summary judgment must be granted when the

opposing party fails to make a showing that supports the existence of an element

essential to the case and on which the opposing party bears the burden of proof at

trial.  Id. at 332-33.  To survive a motion for summary judgment, the nonmoving

party may not rest on her pleadings, bald assertions, or conclusory allegations, but

rather must provide case-specific facts demonstrating that issues of material fact

exist for trial.  Heisler v. Met. Council, 339 F.3d 622, 626, 628 (8th Cir. 2003).

Summary judgment should seldom be used in employment discrimination cases.

Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.    Plaintiff's Allegations

The Complaint does not parse out Plaintiff's ADA and MHRA claims.

Rather, it merely states that "Defendant [] violated the ADA and MHRA by failing

to reasonably accommodate Plaintiff's disabilities, as they existed, or as Defendant

perceived them."  (Compl. ¶41.)  Plaintiff asserts that to the extent Defendant is

claiming to base her termination on its concern that she would steal narcotics,

that argument is without merit since Defendant only learned about the theft from

St. Joseph's during this litigation.  Plaintiff also states that since Defendant knew

about her chemical dependency, its failure to assist her in complying with the

Plan was discrimination.  (Pl. Mem. Opp. Mot. Summ. J. 8.)  Plaintiff asserts that

Defendant "was afraid that, because she was chemically dependent, Plaintiff

would steal narcotics from its infant patients when it was not looking, and

8

Defendant would not catch her soon enough." (Id.)  Plaintiff asserts that

Defendant "arbitrarily created an extremely restrictive reading of the terms of the

Plan without studying it." (Id.)

 The ADA prohibits discrimination by an employer "against a qualified

individual with a disability because of the disability of such individual." 42 U.S.C.

§ 12112(a).  The MHRA prohibits an employer from discharging an individual

based on the individual's disability.  Minn. Stat. § 363A.08(b).  Both ADA and

MHRA disability discrimination claims are  analyzed under the McDonnell

Douglas burden shifting analysis.  Under McDonnell Douglas, the plaintiff bears

the initial burden of proving a prima facie case of discrimination.  McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Hoover v. Norwest Private

Mtg. Banking, 632 NW.2d 534, 542 (Minn. 2001).  The defendant then has the

burden to articulate a legitimate, nondiscriminatory reason for the adverse

employment action.  Id.  Finally, to prevail, the plaintiff must show that the

defendant's proffered reason was a pretext for discrimination.  Id. Federal

precedent may be used to construe the MHRA.  See Reiff v. Interim Personnel,

Inc., 906 F. Supp. 1280, 1292 (D. Minn. 1995) (citations omitted).  It is

appropriate, therefore, to treat both ADA and MHRA claims together.  See Larson

v. Koch Refining Co., 920 F. Supp. 1000, 1004 (D. Minn. 1996).

### 1.   <u>Prima Facie Case</u>

To prove a prima facie case of employment discrimination a plaintiff must prove (1) that she has a disability within the meaning of the ADA or MHRA; (2) that she is qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) that she suffered an adverse employment action because of her disability.  <u>See</u> <u>Burchett v. Target Corp.</u>, 340 F.3d 510, 516 (8th Cir. 2003).  The plaintiff bears the burden to prove she is disabled.

Plaintiff argues that she was discriminated against in violation of the ADA and MHRA because the hospital terminated her based on her disability, and made no attempt to accommodate her chemical dependency disability.  Plaintiff seems to be arguing that she is disabled because she is both an alcoholic and an illegal drug user.

### a.   <u>Whether Plaintiff is Disabled or Perceived as Disabled</u>

"'Disability' means any condition or characteristic that renders a person a disabled person.  A disabled person is any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment."  Minn. Stat. § 363A.03 subd. 12.  The standard is substantially the same under the ADA.  <u>See</u> 42 U.S.C. § 12102(2)(A).  Major life activities include activities such as caring for oneself, performing manual tasks, walking, seeing,

hearing, breathing, learning, sitting, standing, lifting, reaching, and working. Fjellestad v. Pizza Hut of America, Inc., 188 F.3d 944, 948 (8th Cir. 1999) (ADA); Sigurdson v. Carl Bolander & Sons, Co., 532 N.W.2d 225, 228 (Minn. 1995) (MHRA). Plaintiff does not state what life activities her disabilities materially limit her in performing, however reading her memorandum in the light most favorable to her, it seems that she is arguing that she is precluded from the major life activity of working. (Pl. Mem. Opp. Mot. Summ. J. at 12-13.)

Merely having an impairment does not make someone disabled. See Toyota Motor Mfg. v. Williams, 534 U.S. 184, 195 (2002). In order to be materially impaired in the major life activity of working, a person must be restricted from performing a "class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." Rojina v. City of Chanhassen, No. C7-02-5, 2002 WL 1461815, at *2 (Minn. Ct. App. July 9, 2002) (citing State by Cooper v. Hennepin Cty., 441 N.W.2d 106, 111 (Minn. 1989)) (unpublished opinion). Therefore, the inability to perform a single job is not a substantial limitation in the major life activity of working. See Kellogg v. Union Pac. R.R. Co., 233 F.3d 1083, 1087 (8th Cir. 2000).

When a plaintiff alleges that work is the major life activity in which she is materially impaired, the court must consider the following: "(a) the number and

types of jobs from which the impaired individual is disqualified, (b) the

geographic area to which the applicant has reasonable access, (c) the applicant's

own job expectations and training, (d) the criteria or qualifications in use

generally, and (e) the types of jobs to which the rejection would apply." Hoover,

632 N.W.2d at 543 (quoting State by Cooper v. Hennepin Cty., 441 N.W.2d 106,

111 (Minn. 1989)).  Failure to establish a prima facie case when considering these

factors should result in dismissal of the plaintiff's case.  Hoover v. Norwest Private

Mtg. Bank, Nos. A03-1347, A03-1796, 2004 WL 1328057 at *4 (Minn. Ct. App.

June 9, 2004) (unpublished opinion).

### i.      __Whether Plaintiff Has an Impairment__

The record contains the following evidence regarding whether Plaintiff is

chemically dependent.  In March 2003, a doctor at the Brainerd Medical Center

noted that Plaintiff only smoked occasionally and did not consume alcohol, but

also that she admitted she "probably shared needles with other drug users" in the

past.  (Harris F. Ex. 13.)  In November 2003 and October 2004, physicians stated

that Plaintiff only used alcohol occasionally.  (Id. Ex. 14, 15.)  In September 2005,

Plaintiff underwent a chemical dependency evaluation as part of her HPSP.  The

evaluator concluded that Plaintiff's cocaine dependency was in remission, that she

was an opiate abuser, and that she was at a high risk for relapse.  (Id. Ex. 17 at

4.)  The evaluator also noted that Plaintiff had used alcohol to cope with stresses

in the past, but that she denied current alcohol abuse.  (Id. at 2-3.)  In November

2004, Dr. Thomas Kowalkowski expressed concern about Plaintiff's cocaine and

opiate use, and opined that she "may be challenged by working around such

conditions, and would have to continue to be monitored with her program and

HPSP."  (Id. Ex. 19 at 4.)  Plaintiff denied drinking more than a glass of wine on

holidays or special occasions (Id. Ex. 17 at 2), and had been drinking when she

fell and broke her leg in December 2005.  (Id. Ex. 18 at 1.)  However, in her

deposition, Plaintiff testified that she has been chemical free since 1988,

admitting only to one relapse – drinking a glass of wine on February 14, 2006.

(Dovenmuehler Dep. at 110.)  Plaintiff admitted to HPSP that she began drinking

in 2004, and that she diverted Vicodin from St. Joseph's hospital for her own use.

(Harris Aff. Ex. 20 at 4.)

Under the ADA, Plaintiff is not disabled if she is "currently engaging in

illegal use of drugs, when the [employer] acts on the basis of such use."  42 U.S.C.

§ 12210(a); 29 C.F.R. § 1630.3(a); Campbell v. Minneapolis Pub. Hous. Auth.,

168 F.3d 1069, 1072 n.1 (8th Cir. 1999).  Plaintiff will only be considered

disabled under the ADA if she is no longer engaging in such activity.  42 U.S.C. §

12210(b). The same is true under the MHRA which provides the following:

"'disability' excludes any condition resulting from alcohol or drug abuse which

prevents a person from performing the essential functions of the job in question or

constitutes a direct threat to property or the safety of others."  Minn. Stat. §

363A.03, Subd. 36.

Plaintiff argues that she is disabled because although she is clean and sober

now, and is fully capable of performing the functions of her job, she is at risk for

relapse, as evidenced by her stealing Vicodin, and that she is disabled as a result.

(Pl. Mem. Opp. Mot. Summ. J. at 13.)  This argument makes no sense.  Plaintiff

seems to be arguing that she is not disabled as long as she is drug free, but that

she is disabled when she relapses.  That turns the law on its head.  Plaintiff is only

protected as long as she is drug free.  Plaintiff certainly was not drug free at the

time the Plan was implemented since she admits that she took the Vicodin for her

own use.  (Harris Aff. Ex. 20 at 4.)  As long as Plaintiff is abusing drugs, she is not

protected by the ADA or MHRA.   Moreover, if her abuse of opiates and alcohol is

causing her objectionable behavior, neither the ADA or MHRA protects her from

the consequences of her conduct.  Larson v. Koch Refining Co., 920 F. Supp. 1000,

1004 (D. Minn. 1996).  See also Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928,

934 (7th Cir. 1995) (reasoning that the ADA is not a "job insurance policy" and an

employer who discharges someone whose underlying disability causes him to be

drunk at work does not necessarily violate the ADA).  While the law protects

Plaintiff in her status as an alcoholic or addict, the hospital is not required to

tolerate wrongdoing.  Larson, 920 F. Supp. at 1004.  In this case, the result of

Plaintiff's wrongdoing, diverting Vicodin, was implementation of the Plan.

Even if Plaintiff was clean and sober at the time she diverted the Vicodin,

that would not end the Court's inquiry.  As mentioned above, under the MHRA,

"'disability' excludes any condition resulting from alcohol or drug abuse which

prevents a person from performing the essential functions of the job in question or

constitutes a direct threat to property or the safety of others."  Minn. Stat. §

363A.03, Subd. 36.  Defendant argues that when Plaintiff is actively using opiates,

she poses a threat to the safety of her patients.  In order to prevail on this defense,

Defendant must rely on "competent medical advice that there exists a reasonably

probable risk of serious harm."  Lewis v. Remmele Eng., Inc., 314 N.W.2d 1, 4

(Minn. 1981).  "An employer who has relied upon competent medical advice that

there existed a reasonably probable risk of serious harm should be allowed some

discretion in determining whether an individual should be disqualified from

employment. . . . If the employer errs at all, it should be allowed to err on the side

of safety."  Minn. Dept. of Human Rights v. Hibbing Taconite Co., 482 N.W.2d

504, 509 (Minn. Ct. App. 1992).

In this case, Care Center Director of Woman and Children Services Jane

Blee, Children's Center Director Anne Cormier, and the hospital's occupational

health department consulted about accommodating the Plan and the effect it

would have on patient care.  Children's Center Director Anne Cormier, a registered nurse since 1988 who is master's prepared (Cormier Dep. at 4), concluded that Plaintiff would pose a risk to patients.  Specifically, Cormier concluded that since the Plan was implemented based on an allegation of narcotics diversion, it was necessary to have another nurse supervise Plaintiff at all times to insure that "the patients [Plaintiff] was assigned to actually got the narcotics that were ordered and prescribed for them."  (Id. at 74.)  Defendant came to this decision after rejecting several other compliance options and after considering its vulnerable patient population, which is sixty percent ICU cases, most of whom are either in private rooms with closed doors or behind closed curtains, and most of whom cannot communicate about their pain or medications. (Id. at 72, 109, 114, 116; Cormier Aff. Ex. 11 at 109; Thomton Dep. at 40.) Although Defendant has a Pyxisis machine to track drug usage and generate quarterly reports, Defendant determined that "in this particular case checking up on meds after the fact was not a safe way to provide supervised access.  And, yes, we followed our past practice and our decision on what supervised access would mean."  (Id. at 41.)

The only evidence cited by Plaintiff to rebut Defendant's competent medical opinion that a reasonable risk of harm existed if Plaintiff was not supervised at all times is the Deposition of Carlene Ulmer, who apparently is a nursing supervisor

or another employee at Fairview, one of Plaintiff's current employers.  Ulmer

testified that Fairview meets the requirements of the Plan by using a pharmacy

audit that tracks the use of medications dispensed by Plaintiff.  (Ulmer Dep. at 22-

24.)  Ulmer also testified that she has never worked at Defendant hospital or in a

NICU.  (Id. at 25.)

　　　　The Court finds that Defendant has provided more convincing medical

evidence.  First, Cormier is a nurse who knows the requirements of the Children's

Center and its NICU – a NICU which has the unique situation of having individual

rooms, closed doors and closed curtains, and a very vulnerable patient population

that cannot tell people if their medications are working.  Second, to the extent

Plaintiff argues that since Fairview does not see Plaintiff as a threat to patients,

that means that Defendant was not justified in doing so, that argument fails

because Plaintiff does not work in the NICU at Fairview.  (Dovenmuehler Dep. at

7.)  The patient population is different between the two jobs.  Moreover, the

unique private room/curtained room set up at the hospital makes supervision

difficult.  It stands to reason that the threat issue must be evaluated in the context

of the actual working environment.  Thus, even if Plaintiff is disabled, she is not a

qualified individual because the chance that she might divert narcotics if

unsupervised posed a threat to patients.  Without this supervision, she was not

qualified to perform her job at the hospital.  See LaMott v. Apple Valley Health

Care Ctr., 465 N.W.2d 585, 590 (Minn. Ct. App. 1991) (rejecting "serious injury" defense in conjunction with nursing home housekeeper, and opining that had the housekeeper been a health care provider, the result might have been different because "understandably, a health care provider must be physically and mentally able to perform the tasks without the threat of injury to the patient") (emphasis in original).  Therefore, Plaintiff does not have an impairment under the ADA or MHRA.

### ii.   Whether Plaintiff is Substantially Limited in a Major Life Activity

The Court must only analyze the major life activities that the plaintiff asserts are limited by her claimed impairment.  Heisler v. Met Council, 339 F.3d 622, 627 (8th Cir. 2003).  Plaintiff asserts that she has "satisfied the 'demanding standard' for qualifying as disabled, by producing evidence of 'an impairment that prevents or severely restricts her from doing activities that are of central importance to most people's daily lives [where the] impairment's impact [is] permanent or long term."  (Pl. Mem. Opp. Mot. Summ. J. at 12 (brackets in original)).  To support this argument, Plaintiff argues that alcoholism and chemical dependency are lifelong illnesses, and that when she is not in remission, she is unable to perform a broad range of jobs that require inter-personal interaction and year-round work.

18

Plaintiff's conclusory allegation is insufficient to demonstrate that her addiction restricts her from the major life activity of working.  See Cody v. Cigna Healthcare of St. Louis, Inc., 139 F.3d 595, 598 (8th Cir. 1998) (holding that just because a disability causes difficulties, it does not mean that it satisfies the ADA's "substantial impairment" requirement).  Plaintiff testified that neither her chemical dependency nor her alcoholism limited her life activities outside of work and that none of her physicians placed any restrictions on her.  (Dovenmuehler Dep. at 112-14.)  Plaintiff has maintained steady employment as a nurse since 1994.  (Cormier Aff. Ex. 1.)  Moreover, Plaintiff's medical records do not indicate that her addictions limited her in any major life activities.  (Harris Aff. Ex. 6.)  Plaintiff's addictions have not even limited her in finding work since Defendant terminated her. (Dovenmuehler Dep. at 7, 163-64.)  Thus, Plaintiff has not demonstrated that she is limited in the major life activity of working.  See Fjellestad, 188 F.3d at 949 (stating that to be substantially limited in the her ability to work, a plaintiff must show that her "overall employment opportunities are limited") (citation omitted).  The only job Plaintiff seems to be precluded from performing is the job from which she was terminated.  Under these facts, Plaintiff is not substantially limited in a major life activity.

### iii.     <u>Whether Defendant Regarded Plaintiff as Disabled</u>

There is no evidence that Defendant regarded Plaintiff as disabled.  In order to establish that Plaintiff was "regarded" as a person with a disability, Plaintiff must prove that Defendant (1) wrongly believed that Plaintiff had an impairment that limited one or more major life activities; or (2) believed that an actual nonlimiting impairment substantially limited one or more major life activity. <u>Brunko v. Mercy Hosp.</u>, 260 F.3d 939, 942 (8th Cir. 2001).  To demonstrate that Defendant regarded Plaintiff as disabled, Plaintiff must "do more than allege that [she] is regarded as having an impairment which prevents [her] from working at a particular job.  [She] must demonstrate that [she] is regarded as precluded from a broad class of jobs."  <u>Shipley v. City of Universal City</u>, 195 F.3d 1020, 1023 (8th Cir. 1999) (citations omitted).

Plaintiff has provided no evidence to support her allegation that Defendant regarded her as disabled other than her conclusory allegation that since Defendant knew about her chemical dependency, Defendant "was afraid that, because she was chemically dependent, Plaintiff would steal narcotics from its infant patients when it was not looking, and Defendant would not catch her soon enough." (Pl. Mem. Opp. Mot. Summ. J. 8.)  These allegations are without merit.

First, Plaintiff admitted in her deposition that she never told anyone at the hospital that she was chemically dependant and that there were not even any

discussions about chemical dependency.  (Doevenmuehler Dep. at 79-82, 115-16.)

Second, there is no basis to make the leap that Defendant's knowledge that

Plaintiff allegedly stole narcotics and was thus required to stay away from

narcotics and alcohol alerted Defendant that Plaintiff was chemically dependent.

There could be several reasons that a person diverts narcotics, such as stealing for

an acquaintance or for the purpose of reselling the drugs.  Moreover, there is no

indication that Defendant considered Plaintiff unable to perform a broad range of

jobs.  The only job Defendant was concerned about was the Children's Center RN

position for which Plaintiff was hired.  Thus, Plaintiff has also failed to prove that

Defendant perceived her as disabled.

In conclusion, Plaintiff is neither disabled nor perceived as disabled, and

therefore has failed to satisfy this prong of her prima facie case.  However, even if

the Court had found Plaintiff disabled, the following discussion demonstrates that

Plaintiff would still not survive summary judgment.

### b. <u>Whether Defendant had an Obligation to Accommodate Plaintiff</u>

Assuming, <u>arguendo</u>, that Plaintiff had satisfied the first part of the prima

facie test, the Court would continue the <u>McDonnell Douglas</u> analysis.  Under the

ADA, discrimination includes "not making reasonable accommodations to the

<u>known</u> physical or mental limitations of an otherwise qualified individual with a

disability . . . unless [the employer] can demonstrate that the accommodation

would impose an undue hardship on the operation of the business."  42 U.S.C. §

12112(b)(5)(A) (emphasis added).  Under the MHRA, reasonable

accommodations are "steps which must be taken to accommodate the <u>known</u>

physical or mental limitations of a qualified disabled person."  Minn. Stat. §

363A.08, Subd. 6 (emphasis added).  An employer is not required to

accommodate disabilities it knows nothing about.  <u>See</u> <u>Miller v. Nat'l Cas. Co.</u>, 61

F.3d 627, 629 (8th Cir. 1995) (citing 29 C.F.R. § 1630.9).

Plaintiff admits she never told Defendant about her addiction problems.

(Dovenmuehler Dep. at 115-16.)  In her employment application, Plaintiff

mentioned only one disability, hepatitis C, and Defendant accommodated that

disability.  "In general, it is the responsibility of the individual with a disability to

inform the employer that an accommodation is needed."  <u>Miller</u>, 61 F.3d at 630.

Plaintiff did no such thing.  To the extent Plaintiff argues that the Plan should

have put Defendant on notice that she was an addict, that argument is pure

speculation and cannot defeat a motion for summary judgment.  <u>See</u> <u>Moody v. St.</u>

<u>Charles Cty.</u>, 23 F.3d 1410, 1412 (8th Cir. 1994).  The Plan does state that

Plaintiff must remain drug and alcohol free and submit to U.A.s, but the reason

for this requirement is not stated.  Addiction is not mentioned in the Plan, and

Plaintiff never mentioned it.  Chemical dependency was never discussed during

the entire time between Plaintiff informing Defendant about the Plan and

22

Plaintiff's termination.  Thus, since Defendant did not know about Plaintiff's alleged disability, it had no duty to accommodate Plaintiff.

### c.  <u>Whether Plaintiff Was Qualified to Work at the Hospital</u>

If the Court had decided that Plaintiff met the first part of the prima facie test and that notice of disability was not an issue, the Court would next decide if Plaintiff is qualified to perform the essential functions of the job.  "The determination of whether an employee is qualified to perform the essential functions of a job involves a two step inquiry.  First, the employee must show that [she] meets the necessary prerequisites for the job, and then [she] must demonstrate that [she] can perform the essential functions, with or without reasonable accommodation."  <u>Burchett v. Target Corp.</u>, 340 F.3d 510, 517 (8th Cir. 2003).  If the employee demonstrates that she cannot perform the essential functions of the job without an accommodation, she must then "make a facial showing that a reasonable accommodation is possible and that the reasonable accommodation will allow her to perform the job."  <u>Id.</u>  An employer need not hire additional employees or reassign existing workers to accommodate a disabled worker.  <u>Fjellstad</u>, 188 F.3d at 950 (citing <u>Moritz v. Frontier Airlines, Inc.</u>, 147 F.3d 784, 788 (8th Cir. 1998)).

One of the requirements of Plaintiff's job was to dispense medications. Plaintiff does not argue that once she was placed on the Plan, she could perform her job without reasonable accommodation – the Plan was an accommodation. Thus, the only issue is whether the accommodation required by the Plan is reasonable.  Plaintiff argues that the accommodation contained in the Plan is reasonable because it is currently being accommodated by two different health care facilities and therefore Defendant's interpretation of the Plan is too narrow.

At issue is the following Plan language: "Maintain supervised access to controlled substances."  Consistent with its usual practice, Defendant considered ways to accommodate the restriction, but concluded that nothing short of constant supervision would work in this situation, given the fragile, nonverbal patient load and the private rooms and isolated beds in the unit.

Specifically, Defendant rejected the idea of reassigning Plaintiff to a position wherein she did not dispense medication or where she would not require additional oversight.  Defendant concluded that this was not a reasonable accommodation for a registered nurse since in the Children's Center "there is no nurse that's not responsible for medication administration."  (Cormier Dep. at 107, 109.)  A "buddy system" whereby someone would check up on Plaintiff occasionally was rejected because "to have somebody available when you have patients on 24 hour, seven day a week infusions of narcotics[,] [a] buddy  just

doesn't cut it." (Id. at 107-08.)  Mere visual oversight was rejected because it did not meet "the need of the patient to have a nurse who can administer narcotics." (Id. at 108.)  Kelly Thomton testified that "[t]he layout of the unit and the way the RNs are assigned to a patient would not safely allow an RN to be pulled to supervise [narcotics] dispensing." (Thomton Dep. at 25.)  Jane Blee testified that in the Children's Center, "the nurses work quite independently, they are alone in a room frequently, those kinds of things that would make it difficult to accommodate that." (Blee Dep. at 19.)  Finally, the option of hiring an additional nurse to shadow Plaintiff at all times was the only option left, and Defendant concluded that it could not provide "one to one nursing to shadow [Plaintiff]." (Cormier Dep. at 106.)  Thus, since all Children's Center RN positions required the nurse to dispense narcotics, there were no alternative positions within the Children's Center to which Plaintiff could transfer.  (Id. at 109, 115.)

Defendant had accommodated similar restrictions in other units of the hospital in the past such as in the Emergency Trauma Center where people work in teams and any medication diversion would be fairly obvious to other team members.  Defendant has also accommodated similar restrictions in units such as oncology and surgical care where the unit is comprised of open bays and the physical set-up and staffing are such that medication diversion would be more difficult.

Plaintiff argues that her case is similar to <u>Wallace v. Veterans Administration</u> in which a registered nurse who was also a recovering drug addict was denied employment in an ICU because the hospital determined that the accommodations necessary to accommodate her disability – restricted access to narcotics and random urine tests – rendered her unqualified for the position.  683 F. Supp. 758, 760 (D. Kan. 1988).  The <u>Wallace</u> court concluded that the accommodations were reasonable and that the hospital had therefore discriminated against the plaintiff on the basis of her disability.  <u>Id.</u> at 767.

<u>Wallace</u>, however, can be distinguished from the instant case.  First, the hospital in <u>Wallace</u> knew about the plaintiff's addictions.  <u>Id.</u> at 760.  Second, there was evidence that less than two percent of an ICU nurse's time was spent administering narcotics, and that many ICU patients received no narcotics at all.  <u>Id.</u> at 765.  The <u>Wallace</u> court concluded that under these facts it was not essential that every ICU nurse administer drugs and therefore the accommodation was reasonable.  <u>Id.</u>  Third, the court also found that the defendant hospital had not considered any feasible accommodations, and had failed to present proof that patient safety would be jeopardized or that accommodating the plaintiff would be unreasonable.  <u>Id.</u> at 766.

In contrast, in this case Defendant did not know about Plaintiff's drug addiction.  Moreover, Plaintiff was hired "to take care of critically ill patients . . .

[who] have continuous narcotic administration, not just here and there.  24/7 they are on narcotics and they are in private rooms."  (Cormier Dep. at 75.) Therefore, all Children's Center nurses need to administer drugs.  Importantly, there was no evidence in <u>Wallace</u> that drug diversion was a potential problem. 683 F. Supp at 759-60.  In this case, diversion was the entire reason for the Plan. In addition, in <u>Wallace</u>, the plaintiff's physician and her rehabilitation program both certified that she was drug free.  <u>Id.</u> at 759.  Plaintiff never provided Defendant with this kind certification.  Furthermore, in the instant case, Defendant considered several options before concluding that constant monitoring and supervision was the only way it could comply with the Plan and still insure patient safety.  Since safety must be considered in the context of the specific job at issue, the fact that other hospitals accommodate Plaintiff is meaningless. Defendant's rooms are private and therefore it would be impossible to provide the kind of monitoring necessary to insure patient safety.  Thus, this case presents a vastly different factual situation from <u>Wallace</u>.

This discussion demonstrates that Plaintiff is not qualified for the job because she cannot perform the job without an accommodation and the accommodation is unreasonable.  Thus, Plaintiff also fails to satisfy this part of the prima facie test.

**d.**      **Adverse Employment Action**

It is undisputed that termination was an adverse employment action.

**e.**      **Plaintiff Has Not Stated a Prima Facie Case**

First, Plaintiff has not demonstrated that she is disabled or perceived as disabled because she admits that her addiction has never limited her in the major life activity of working and the evidence proves that she is not precluded from doing an entire class of jobs.  Second, it is undisputed that even if Plaintiff was disabled, Defendant did not know about Plaintiff's disability and therefore had no duty to accommodate at all.  Lastly, Plaintiff has not demonstrated that she was qualified for her job because the accommodation she needed to perform the job is unreasonable.  Thus, since Plaintiff has not stated a prima facie case, Defendant's motion must be granted, and the Court need not go any further in the analysis. However, even if the Court concluded that Plaintiff stated a prima facie case, the following discussion demonstrates that Defendant's motion would still be granted.

**2.**      **Nondiscriminatory Reason for Plaintiff's Termination**

Defendant argues that terminating Plaintiff because the accommodation contained in the Plan was unreasonable establishes a legitimate nondiscriminatory reason for the termination.   The Court agrees.  As discussed above, given the fragile patient load in the Children's Center, the only way Defendant felt it could insure patient safety was to hire an additional employee or

to reassign existing employees to assist Plaintiff in performing her job duties.  This is consistent with the way Defendant interpreted this restriction in the past. (Thornton Dep. at 22-23.)  Since this was not possible, Plaintiff was not qualified to perform the essential duties of her job and was accordingly terminated.  The burden thus shifts to Plaintiff to prove that Defendant's stated reason was actually pretext for discrimination.

### 3.   **Pretext**

Evidence of pretext is viewed in the light most favorable to the employer. Sprenger v. Home Loan Bank, 253 F.3d 1106, 1111 (8th Cir. 2001).

Plaintiff argues that her firing was merely pretext for disability discrimination.  Portions of Plaintiff's arguments are reproduced here:

> Defendant . . . must have based its decision to terminate Plaintiff upon her chemical dependency, her necessary participation in HPSP, and its unwillingness to accommodate the Plan. Defendant can deny it fired Plaintiff because of her disability, but it cannot change the fact that it has admitted that it was the terms of the Plan itself, and Defendant's consequent new perception of Plaintiff as a drug addict because of the language of the Plan—not St. Joseph's—that caused Defendant to fire Plaintiff.
> . . . . .
> Defendant claims Plaintiff's Plan is the only HPSP monitoring plan Defendant has not been able to accommodate. So why has Plaintiff been singled out? What if Defendant fired Plaintiff because of what transpired at St. Joseph's and tried to cover it up by refusing to accommodate her Plan? Certainly Defendant would be liable if a jury found this to be true. . . . Perhaps Cormier thought another HPSP participant would be too much for her to handle, so she fired Plaintiff. Perhaps Cormier and Thornton did not want another recovering drug addict to account for, or monitor.

. . . . .
> For the first time, Defendant claims its newly discovered evidence—
> that it knew Plaintiff was terminated for "theft of narcotics" at St.
> Joseph's—provides its legitimate reason for terminating Plaintiff.
> Defendant cannot now claim as its legitimate reason something
> Defendant did not even know about at the time it decided to
> terminate Plaintiff. On the other hand, perhaps Defendant decided to
> use its inability to accommodate the terms of Plaintiff's Plan as
> legitimate cover for firing Plaintiff based upon unsubstantiated
> rumor.

(Pl. Mem. Opp. Mot. Summ. J. at 17-20) (internal citations omitted).

These arguments are speculative and inflammatory. There is no evidence of pretext. Defendant interpreted the restrictions in the Plan in its usual way, but could not accommodate the restriction in the Children's Center because of the unique situation presented by that unit. Moreover, contrary to Plaintiff's argument, Defendant did know that Plaintiff was accused of diverting narcotics at St. Joseph's because Plaintiff told Chawla why she was put on the Plan. Thus, Plaintiff's allegations that this is somehow a reason adopted purely for litigation purposes is completely unsupported. Certainly Defendant is not required to ignore the possibility that Plaintiff might divert drugs when making decisions about patient safety. Moreover, there is no evidence that Defendant considered Plaintiff a drug addict. The unrebutted evidence is that dependency was never even discussed, and that Plaintiff never told Defendant she was an addict. Plaintiff was terminated only because Defendant could not accommodate the Plan's restrictions. Therefore, no evidence exists that Defendant's decision was

pretext for discrimination, and Defendant's motion must be granted on this basis also.

### C.     CONCLUSION

Plaintiff is not disabled under the ADA or MHRA.  Defendant terminated Plaintiff because Defendant was given an HPSP plan that it could not fulfill with any reasonable accommodation.  Defendant knew nothing about Plaintiff's chemical dependency at the time it terminated her.  Thus, Defendant's motion is granted.  It follows that Plaintiff's Motion in Limine Excluding the July 31, 2006 Opinion of Daniel Dossa is denied as moot.[1]

Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.  Defendant's Motion for Summary Judgment [Doc. No. 17] is **GRANTED**;

2.  Plaintiff's Motion in Limine Excluding the July 31, 2006 Opinion of Daniel Dossa [Doc. No. 47] is **DENIED AS MOOT**; and

3.  This case is **DISMISSED WITH PREJUDICE.**

Dated:  November 30, 2006

s / Michael J. Davis
Michael J. Davis
UNITED STATES DISTRICT COURT

---

[1] The Court did not consider this report when deciding this motion.